May it please the court, my name is Doug Willans, I represent the lead plaintiffs in this action against Syneos Health, which was formerly known as INC Research Holdings, and just for consistency purposes, I'll refer to them either as INCR or INC, which is the way we dealt with it in the briefing. The district court erred in dismissing our amended complaint for securities fraud claim on Sienta grounds and our proxy Section 14a claim on materiality grounds. But before I jump into my Sienta argument, I think it's just important we step back and briefly discuss what are the actual misstatements at issue here, because I think there was a disconnect between, certainly a disconnect between us and defendants as to the import of those misstatements, but certainly a disconnect between the magistrate court and the district court who issued differences of opinion regarding those statements. So the first misleading statements we allege are those relating to what is the best metric to evaluate this newly acquired commercial business that, and again, the entirety of the case focuses on INCR's acquisition of this private company called Inventive, which had this very lucrative and desirable commercial business. So the first statement, the leading indicator statement, as we refer to them in the briefing— Does that matter? If I don't read that as at all saying it's the best metric or that it's making a categorical judgment, but it's just saying that it is a leading indicator, right, hence the word a, does that matter for your argument? If I read their statement as saying in May of 2010 that one of the two things that they thought were important for their confidence, one of them was that new drug approvals were a huge leading indicator instead of the best indicator, does that eliminate your argument? Our answer to that is yes and no. Our position is yes, they're talking about what the leading indicator for that business is. The leading indicator. We should read a leading indicator to be the leading indicator. Well, in the May statements, they say a huge leading indicator. In the July statements, they say the leading indicator. When you get to September, they say new drug approvals, there's some correlation. It's a pretty strong correlation. Then they say it's a simple metric, but it's the best one we can give to you right now. So yes, they are saying it's the best metric. The no part of that is whether – we're not disputing here that new drug approvals are important. Obviously, if they've got no new drug approvals, they've got no business. But if you assume that the statement is literally true that it's a leading indicator, it's still misleading because what it does is it tells the market that the leading indicator is this vast array of new drug approvals. In May at the time, it was 20, but what really drives that business is these large-scale, what we call – or what defendants call 100-plus sales contracts. So there's a difference when you're saying – So when it says – and I don't have the statement in front of me, but it says that our confidence depends on two things, right? One, these new drug approvals, and two, our pipeline discussions. Why isn't the pipelines discussions? Like give a reasonable investor a pretty good idea that the number of drug approvals standing alone is not the entire ballgame, right? We're confident on this based on the new drug approvals and pipeline discussions, which means like deals that aren't closed yet, right? Well, that gets to sort of the – I guess the second and related misstatements that we allege where they're saying if you look at the new drug approvals at – and they're saying year-to-date 24. At the time they're making these statements, there is nothing in the pipeline. So what we're saying is it's a leading indicator because there's new drug – What's the record to say there's nothing in the pipeline? They have – the record is at the time, let's just say in May of 2017, they're saying new drug approvals are the leading indicator. There's 20 new drug approvals currently. At the time they made that statement, there's only been two bids put out by the commercial division on new drug approvals. So it's 20.  So our interpretation is that those two but also anything that – any discussions that preexist a bid are not part of pipeline discussions? I'm not sure I'm understanding. Well, what we're talking about, they're talking about their business going forward. So deals made in 2017 goes to their gross issues for 2018. They have bid – we're not talking about pipeline contracts that were already signed. The year before in 2016, for example, of the 22 drugs that were approved, only five gave rise to these new drug – sorry, these 100-plus contracts. And they only won two of those. So there was only two drugs in the pipeline before. As you get to 2017 and they're soliciting – again, this all comes in the context that they're soliciting investors to vote in favor of this merger. They're saying newer drug approvals are the leading indicator. But what they're not saying and what they're not telling the market is of the 20 in May, there have only been bid on two and they lost both. When you get to July, they say, look, the leading indicator of how this business is going to do is new drug approvals. The number at that point is up to 24 in the pipeline. The other numbers don't change. They still only bid on two and they still have zero in the pipeline. But they also say in July that we've got to close the business in the second half. So it's that – There's no business to close. There's nothing in the pipeline. They have got no new deals. There doesn't have to be anything in the pipeline. They don't represent that anything is definitely in the pipeline. Well, but they're saying at the moment, I guess that's the focus of our case. They only say new drug approvals are pretty strong so far this year, which is a precursor to the commercial. We've got to go close the business in the second half of this year in commercial business for sure. Yes. So it's – But at the time they're making that statement, there are 24 new drug approvals out there. They've bid on only two of those. Those two were pre-class period, and they've got none. So there's no business at that point. Maybe there's maybe some – that's our point. At the time they're currently making that statement, there is none. There may be some that may materialize down the road. Records show when the two bids were rejected. They were – I don't – we don't know definitively, but we know it was before they announced the merger. So it was before May of 2002. I'm sorry. May of 2017 is when they occurred. But the point is at the time they made the statements, we're talking about what they currently knew. And they currently knew in July that there were 24 new drug approvals, zero new bids were made, and zero new contracts were entered. So at the time they're talking about their pipeline, then they've – Excuse me. She's asking you a question. I'm sorry. But also under their business model, wasn't it more likely that the commercials came within the last quarter? Yes. Yes, that's exactly what we're saying. But first we're saying at the time they made the statement, they had none. So, like I said, there could be some that may materialize down the road in September. But, again – Which is consistent, then, with the statement that we have to close the business in the second half. But I think you're ignoring the part of the statement that says, but if you look at what's happening now, we've got pretty strong growth. We've got – or this is a leading indicator – I'm sorry. Give me the statement where they said at that point they already had strong growth. What I'm saying is the statement in July, new drug approvals are pretty strong so far this year, which is a precursor to the commercial. We've got to close that business in the second half of the year in the commercial business for sure, but at least the leading indicator is good for that business. But what we're saying is – That is the opposite of what you just represented, Dash. You just said that they said they had good growth as of that time, and they're saying exactly the opposite of that. They're saying we might get good growth. But they're saying – but the point of the – where the falsity and the misleading nature of that statement is is that the leading indicator – Which statement? The falsity of the statement you made or the falsity of the statement – which falsity? The statement of the – that I just read is misleading because it gives the impression, the false impression to investors that the leading indicator for this business is new drug approvals when the leading indicator is these 100-plus contracts that they're going to bid on. So in July, there are zero contracts that they've bid on. So that statement is false when they tie the growth – the rise of new drug approvals to potentially strong growth down the road. Zero. Then to focus, Judge Giles, back on your point about late-end sales, and the district court focused on that, but what I'll point out to you is in September – I'm sorry, November of 2017 when the class trade ends. They make the statements that we say are the revelations of the truth. That's the end of the third quarter. That's not the end of the year. And what they do at that point is they say, listen, the growth – we're going to experience flat growth for next year. So at that point, what that means is they knew at the end of the third quarter that sales were not going to materialize to meet what their growth projections were. So they didn't – the end of year was irrelevant at that point. So what I'm saying is it's misleading to go and say that new drug approvals were the key factor here, the key metric, when they weren't. They were a factor, but it's misleading to tell investors that you're going to – that the number of bids in play is 24, for example, when you're only bidding on two and you've got no contracts in the pipeline. So that's where we come out on the false statements. Can you give me an insight in the May call when they say pipeline discussions? You seem to be using the word pipeline in, like, I think four different ways. But can you tell me what you think we need to interpret that statement to be when they said pipeline discussions, that phrase, what that means? What I'm saying is contracts that they have signed that are – will likely, when the contracts come in and there's, I'm sure, some administrative process to get them up and running, that will lead to the generation of revenues down the road. So at that point in time – You think in the May call when it says pipeline discussions, you mean that – you interpret that to be contracts that are signed? Yes. I think – or bids – we can look at it as bids that are – No, I want to know what you mean. That's what I'm asking. If you think it means contracts signed, that's fine. I just want to understand – I'm saying at that point there's no business. You use it for several different things. I'm trying to understand what your theory of pipeline discussions is. Contracts signed or something else? Well, our theory is at that point in time there were two potential bids to be made and no signed contracts. I'm not asking the facts. I'm asking what do you understand that phrase to mean in May? I'm saying that they have no business signed that would generate revenues. Okay. So the answer is contracts signed. You're not deviating from that answer. Well, I'm – I guess it's the whole process of did they make a bid? Did that bid become accepted? And then if it's accepted, there's a signed contract. So it's the whole process at that point. Does it only include actions that happen after a bid is formally submitted, or does it include discussions that happen before a bid is submitted? I guess I don't – there's nothing in the record that talks about what is happening – I don't know their process of submitting a bid. What we do know is commercial at that point had only submitted two bids. So when they're saying this universe of 20 new drug approvals – Forward is the only thing that's included when it says pipeline discussions. Yes. Now, when we get to – when I get to the actual Siento argument, our main argument on this – This argument, if you fail on this argument, does it resolve both claims? I get the district court addressed. Yes. The Siento with respect to – Oh, no, wait. I'm sorry. I didn't mean to jump the gun. So this was the – the misstatement was the 14A claim was how the district court addressed it. Yes. But the same misstatement applies to the 10B claim. Correct. At least for the 10B claim, it's the statements in May, July, and September. All right. In the proxy claim, it's just a May statement because the proxy came out in June and the – But if we found there was no misstatement in any of these – Yes. That resolves both claims. Yes. That's correct. So just to – I don't know if – I only have 20 seconds left. Does the court have any questions on the actual Siento argument? I mean, basically – okay. Thank you. I think you've got some time on your bottle, I think, so yeah. Mr. Frawley. Thank you, Your Honor. And may it please the court, it's Brian Frawley along with my co-counsel, Joni Jacobson from Chicago, and Lee Whitman from Raleigh, on behalf of defendants. The district court's decision should be affirmed for at least two reasons. As was alluded to a little bit this morning, this case is built upon misinterpretations and mischaracterizations of the actual statements. The actual statements were true, and they were forward-looking and not actionable, and there is no remote pleading of Siento here. I want to take a perhaps unorthodox approach to this and talk about the – Can I just ask one question? Is it – so the misstatement point resolves both claims, but does Siento resolve both claims, or is that only the 10B? So if we resolve Siento on 10B, do we still have to address the misstatement or omission because the 14A – or we have to address whether Siento is required in 14A? Your Honor, it depends on the conclusion you reach about the misstatement. If, as the district court ruled, we believe it is required by this court's Boykin decision from two weeks ago that the statements are forward-looking, Siento applies to both claims. If the court believes that there is a non-forward-looking, actionable statement, there is an open question about Siento under the Section 14 claim that hasn't been briefed and I don't think is before this court today. The November statement that my colleague refers to – Counsel, sorry, just can you – you started by saying the statements are true and they're forward-looking and non-actionable. Are those sort of alternative arguments? Yes, they are, Your Honor, because even if the statement is inaccurate, if it's forward-looking, it's not actionable. But if it is not actually a materially misleading statement, it doesn't matter if they're forward-looking. That's correct, Your Honor. The statement that precipitated this lawsuit, the oblique reference to 100-plus contracts that happened in November, if the court reads that statement, it says nothing remotely like what the plaintiffs have said. What Mr. Rush said is that what I'm going to tell you is directionable. Don't take my word for this. There's a lot of different things, but one of the reasons, one of the reasons why our revenue projection for the following year fell three percentage points lower was because of a lack of larger business that we've won so far this year. Now, the commercial division had over a billion dollars of revenue. My colleague just argued repeatedly that they had no business. The lack of 100-plus contracts, as Mr. Rush described it, was just one of the reasons why instead of having a billion, 10 million of revenue or a billion or 20 million of revenue fell 10 or 20 or 30 million dollars short. It went from mid to high single-digit growth to low single-digit growth on a billion dollars. It's a couple of tens of millions of dollars. This isn't a question that the company had no business. It's a question that the business it won didn't generate as much revenue. Besides that, it can't be a forward-looking metric as to whether or not the contracts you ultimately sign generate 10 salespeople or 100 salespeople. That's sort of like a record company saying I got a bunch of good acts coming in. It's going to be a good year. And then somebody says, well, how many of them are going to be gold records? You don't know that answer until you get the contract, you go out into the market, and you generate business. That's not a forward-looking metric. It's a backward-looking metric. Now, Judge Richardson hit on this before, but I want to be clear. There's only one place in the entire class period that the word best metric was used. Nevertheless, that's what this whole case is supposed to be about. In the one place, it said nothing like what the plaintiffs say. There was a question asked, and this is a quote. Are there any metrics? It's joint appendix 696 to 697. Are there any metrics that we can track or look at where you can say that if we see X number of new drugs approved, growth will be Y at some point in the future? Answer. Let me answer that question this way. To be determined, I think that new drug approvals is a metric that has some correlation. The way that correlation can be strongest is when you start going through the following diagram, and Judge Richardson alluded to this before, and Mr. Rush goes through why the metric is broken as a measure of future revenues, not why it was the best one. And then he comes to the end of that and says, so you can break that correlation pretty quickly as you go down that list. And so it's too simple of a metric, but it's the best one we've been able to give you to date. Stay tuned. We don't even own the business yet. There was no misstatement here. As this court said just early this year in Marriott, in order to assess whether there is falsity, you first strip the plaintiff's mischaracterizations and look at the true statement in its context. And we submit that if you look at the true statement in its true context, there is no misstatement. And frankly, the plaintiff's arguments don't say otherwise. At page 7 of the reply, plaintiffs say the following. It is literally true that rising new drug approvals may signal a potential benefit to commercials business. We submit that literal truth ends this case. As this court said in Marriott as well, that the problem for the plaintiff's complaint is that their allegations don't contradict the defendant's statements. Counsel, can I just ask you how you understand the district court's decision under 14E? Did the district court say there are no misstatements, or did the district court say, well, these are forward-looking statements and everything is within the safe harbor because you have the cautionary language? I think the district court collapsed all of those findings together, which is proper under the securities laws because all statements have to be read in context. The context of one version of context is for a forward-looking statement as to Bespeak's Caution Doctrine. But for any statement, it's read in context. And what the district court said at page 26 of the opinion, Judge Flanagan said the following. Considering the total mix of information available to the reasonable investor, including the extensive and specific cautionary language provided by the defendants, the alleged misrepresentations and omissions were not materially misleading. And that's what we're here for. They weren't materially misleading, whether you look at them under the lens that they weren't false or you look at them at the lens that they were forward-looking statements and covered by the Bespeak's Caution Doctrine. So just really just kind of technically, you want us to affirm on the reasoning of the district court or do you want us to affirm on a slightly different ground, which is who cares if they're forward-looking or not because they're true? I would concede, Judge Harris, that if the court finds that the plaintiffs have failed to plead falsely, full stop, that that's a slightly different version of how the district court reached the absence of a material misstatement. But that doesn't mean that it's not brought before the court because the district court found no material misstatement, whether it was because an omission was disclosed or because the statement I'm just trying to figure out how these ideas work together, and I actually did think that the district court was kind of melding two things that kind of get you to the same place, but I just wanted to know how you were viewing that. Yes, and I think, Your Honor, that this court's Paradise Wire decision did a similar treatment to a proxy claim. It looked at the statements in their totality because some were forward-looking, some perhaps not, and concluded that under this court's precedent and under the Bespeak's Caution Doctrine that there was no actionable statement. But no matter which way you look at it, this court's decision from two weeks ago in the Boykin v. K-12 decision makes clear that these statements are forward-looking by any measure and therefore not actionable under this court's precedent. In Boykin, the court was addressing a situation where an online learning company said at the outset of the pandemic that school closings and other pandemic-induced events, current facts, bode well for our future revenue and future growth. That's exactly what the plaintiffs say happened here. Current events, which are not alleged to be inaccurate, that do drugs were on the rise, bode well for the future. It's a forward-looking statement under this court's decision from two weeks ago. It's a forward-looking statement under this court's decision in Robb from 30 years ago where the defendant said new regulations was going to create a marketplace for our services that was going to fuel 20 to 30 percent growth over the next several years. Same thing, same result, forward-looking statements, not actionable. Beyond the statements, my colleague didn't get to the scienter. It was probably better for him because the claim here that there's pleading of strong inference of scienter on this record is not possible. It's not possible because of the misstatement theory that they espouse, which I'll come back to in a second, but also what they say in their complaint about what happened here is not just, as we heard this morning, that full stop, you didn't get these 100-plus contracts, and so therefore your projections were in jeopardy. What they say in their brief and in their complaint is, for example, no other new contracts materialized during the remainder of the year. That's their opening brief at 50. The defendants didn't gain new business sufficient to compensate for their failures. It's paragraph 8 of the complaint, 28 of the joint appendix. The expected revenues did not materialize because they didn't make up for their failures. That's plaintiff's brief at 30. When the deal was struck, there was only one quarter of business under the belt. The statements in May were talking about a business, as Judge Harris alluded to, that was weighted towards the end of the year. Revenues were weighted towards the end of the year. And by its nature, drugs were being approved. Opportunities are coming to market. As Judge Richardson said, what's the pipeline? The pipeline is opportunities. Opportunities only mean revenues if you convert them to customers. I asked your colleague how he wanted us to interpret pipeline discussions, and he wanted to interpret that, it seems to me very narrowly, to only start once a bid has been made. And I guess I'm curious your take on how, I think what we're basically asking is how a reasonable investor would understand the phrase pipeline discussions. I think the reasonable investor would apply the dictionary meanings of plain English. What is said there, and this is paragraph 99 of the complaint that's quoted in full. It's also in the appendix at 238. What Mr. Rush says is the best two indicators is what's in the sales pipeline. Think of a software company. A software company has no backlog when they start the year, and they build their forecasts. Their analysts figure out what the revenue is going to be based on two things. Where are the markets going, and what's that company's particular spot in the market? So Mr. Rush reiterated right after the statement that they say was suggesting that new drug approvals was a harbinger of great success for the defendants. It's a great harbinger of where the market is. The question is where's your spot in the market? Are you going to win the business, or are your competitors going to win the business? So by definition, the way this statement is, and this is an oral comment in an analyst call, the statement is the pipeline is what the market is. You've got to go win the business. Now, in terms of Sienta, again, you haven't seen in the briefs, and obviously my colleague didn't get to it this morning, but there is no case from this court ever that supports anything about the Sienta theory here. Again, two weeks ago in Boykin, this court ruled that a statement that's not clearly false is a strike against Sienta. By any measure, this statement was true, but in Plankton's best case, as they argue in their reply, they were entitled to inferences from an ambiguous statement, and so their argument itself hampers their Sienta theory. Perhaps more importantly, there is no theory, allegation, or incline of motive to defraud here. And this court has said time and time again, including in Triangle Capital, while the absence of motive isn't fatal, it weighs heavily in the Sienta balance. Beyond that, securities cases are usually filled with confidential witnesses and documents and statements. One of the few cases that this court recently has found Sienta to be pled in the Zach case, which is referenced in the plaintiff's brief, the defendant said something about what happened in a meeting with the FDA that was contradicted by the official statement of the FDA about what happened in the meeting. Now, there's nothing like that here. There's no document, no confidential witness, no prior statements, nothing. It suggests that the defendants had any knowledge of what the plaintiffs say, and of course it's hard for them to do that because they fabricated the misstatement so you couldn't possibly have had knowledge about it. Beyond the lack of allegations of any cogent or compelling inference of fraud, as the court is aware, even if you get to that point, you next have to, under TELL Labs, balance the competing non-fraud inferences against whatever inference of fraud may exist. And we submit there are none. The statements were ambiguous at best. There's no motive to defraud here. The company was candid about the infirmities in this metric and how it was an imperfect metric and how it would only result in revenues if it went out and won the business. In KBC and again in Yates, this court has ruled consistently that a company's candor about its statements militates against the enter. In Ottman, this court found that statements made by a company in the midst of integration of about a merger militates against the enter. And this is probably the most important part of this. INCR didn't own this business until August 1st, a month into the third quarter. My colleague this morning was referencing the fact that this was the third quarter. INCR bought the business one month into the third quarter. In its earnings announcement for that quarter, it adjusted its future guidance. The securities laws are based on periodic reporting and they gave that report at the earliest opportunity when they owned the company. And unless the court has further questions, I have nothing further. Thank you. Thank you, Your Honor. Thank you, Your Honor. I'll return to where I started in the brief, which is when you look at cases like this, as the Fourth Circuit instructs, you look at context and you look at common sense. So the context of the statements that we're alleging to be misleading here were made with respect to they're trying to solicit investors to vote in favor of the merger. So what we're talking about here is they're trying to sell the company. They're trying to, and again, as defendants admitted at the end of the class period, this was a private company they purchased. So investors were flying blind as to what was going on. So when they say the leading indicator of this business is new drug approval, and my colleague says, well, I'm fabricating the falsity of that. What we're saying here is that even if you say that it's literally true, that it is a leading indicator, it's still misleading because it gives investors a false impression of the types of business that commercial was going after. They were only going after large-scale contracts. So of the 20 or so bids that were, or 20 or so new drug approvals that were out there, they're only bidding on two. So when, if you want to call it motive, I mean, what they're trying to, you know, they're trying to sell the business. This is a $4.6 billion acquisition. It doesn't look good to investors to say we're buying this company for $4.6 billion, but at present we have got no business in our pipeline. Can I ask you about motive? Because I just, it's not my thing, so I may be missing something. But if, I mean, to show that they knew this was false, or at least were reckless about it, but possibly that they knew it depending on whether we think these are forward-looking statements. Why would they have been trying to get investors to approve a purchase of a company that they actually knew was not very well set up for future earnings? What's the point? Well, we're not saying that it, again, this is not a case about business that didn't materialize down the road. We're saying that they didn't make projections that didn't come true. What we're saying is this was a successful business before. It was coming off a 2016 year that had a record number of low new drug approvals coming through. So the business was on the downside to begin with. So when we're looking at why are you selling this, what are you selling this company about that you purchased for $4.6 billion to investors, you're looking at, well, what is in the pipeline? What are the number of contracts that you're bidding on? So it's not that they were trying to mislead the market about how, our case is not about their business judgment in purchasing this company. We're not saying that at all. We're also not saying that, well, they didn't integrate these two companies properly. What we're saying is at the time they were making these statements to investors, the business wasn't what they thought it would be. The internal numbers were not matching with what was coming in for the business. And how do we know that, or how do we say that defendants… So if that's, I mean, if your theory is true, why did they want the merger approved? Well, I think there certainly could be a time down the road where these new drug approvals will generate, or they will be able to bid on these large-scale contracts. And as a matter of fact, as soon as the class parade ended, they changed the business, the historical business model of this commercial business, because this was a company that relied heavily on these large-scale contracts. So if they didn't show up, they were subject to huge revenues. That's true. That's just what they have said. What I'm having trouble understanding is like what sort of goes back to what is their motive. And I know you made a motive argument below, but you've abandoned that on appeal. So I can't understand what their motive is. Well, we don't – we don't have to plead motive. I'm not saying you have to, but you said – you're the one that brought up motive. You said their motive was to get them to approve the merger. They entered this deal. They spent five months scrutinizing it. So that's the motive, like basically time sunk, like, oh, we put all this time into it. No, no, but they've already committed to spending the $4.6 billion. At the time they make the statement in May, there's no contracts. So we say, okay, well, we don't want to go and tell the investors that we just spent $4.6 billion on a company that presently – And it's definitive it's not approved. True, but they're trying to say – I mean that's what the agreed upon purchase price was. I mean, yes, if investors don't approve it, it's not going to go through. But they're still trying to give the company that they're purchasing the best light available. And at the present time, there were no contracts that would generate revenues for 2017. They still had contracts from prior years that were generating revenue. So to the defendant's point, there was prior revenues. But what we're saying is for what they were saying the growth was going to be in 2018, there was nothing that they knew about that would sustain those figures. Sorry, I'm having a little trouble seeing the clock. Thank you very much. We appreciate it. Thanks to all counsel for helping us with this case. We're sorry we can't come down to shake hands, but we wish you all the best.  Thank you, Your Honor.
judges: Pamela A. Harris, Julius N. Richardson, Patricia T. Giles